DA 25-0675

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 160N

IN THE MATTER OF:

D.J.L. and R.J.M.,

      Youths in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause Nos. DN-7-24-098-YC and
DN-7-24-100-YC
Honorable John W. Parker, Presiding Judge

COUNSEL OF RECORD:

      For Appellant Father:

          Gregory D. Birdsong, Birdsong Law Office, Santa Fe, New Mexico

      For Appellant Mother:

          Daniel Eakin, 406 Law, Sidney, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Christine Hutchison,
Assistant Attorney General, Helena, Montana

          Joshua A. Racki, Cascade County Attorney, Valerie Winfield, Deputy
County Attorney, Great Falls, Montana

Submitted on Briefs:  June 24, 2026
Decided:  July 21, 2026

Filed:

                _____
                              Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Father, D.L., appeals the Eighth Judicial District Court's August 13, 2025 Order terminating his parental rights to his son, D.J.L.[1] Father raises two issues: (1) whether the District Court clearly erred in finding the Department of Public Health and Human Services, Child and Family Services Division (the Department) diligently investigated whether D.J.L. is an Indian child under the Indian Child Welfare Act (ICWA); and (2) whether Father received ineffective assistance of counsel primarily for failing to raise Father's potential parole date at the termination hearing.

¶3 On July 5, 2024, the Department received a report that Mother was intoxicated and unable to care for her three children, including then-two-year-old D.J.L. Law enforcement observed Mother slurring her speech and blowing a .313 BAC. The children were removed and placed with a prior foster placement.

---

[1] Upon unopposed motion by Mother, the Court consolidated the appeals involving her two children: DA 25-0675, regarding D.J.L., and DA 26-0089, regarding R.J.M. After consolidation, counsel for Mother filed a Motion to Withdraw as Counsel, accompanied by an *Anders* brief. An order addressing that motion and dismissing Mother's appeal is being filed simultaneously with this Opinion.

¶4 The Department's petition stated there was "reason to know" that D.J.L. might be an Indian child, identifying possible affiliation with the Chippewa Cree Tribe. The confidential intake report also referenced possible Little Shell, Gros Ventre, and Assiniboine ancestry on Mother's side.

¶5 The Department immediately initiated an ICWA inquiry by asking Mother about tribal affiliation; she was unable to communicate whether she had any. It personally served Father with a notice listing all known direct lineal ancestors and tribal information and instructed him in **bold print** that he had a duty to notify the court and counsel of any additional information. The Department sent certified ICWA notices and supporting documents to the Chippewa Cree Tribe and the Rocky Mountain Region of the Bureau of Indian Affairs (BIA). It also sent "attempt to contact" letters to Father, but he never responded.

¶6 On July 18, 2024, the Chippewa Cree Tribe responded that D.J.L. was not eligible for enrollment. On July 23, 2024, the Blackfeet Tribe likewise responded that D.J.L. was not enrolled or eligible. The District Court repeatedly found ICWA inapplicable in orders dated October 30, 2024; February 18, 2025; May 21, 2025; and August 13, 2025. Father never provided additional ancestry information, never contacted the Department, and did not appear at any hearing except through counsel.

¶7 At the time of the termination hearing, Father had been incarcerated since shortly after D.J.L.'s birth. The Department introduced evidence that Father was serving four commitments with the Department of Corrections (DOC), three of which were 48-month sentences imposed September 20, 2022.

¶8    The record reflects a consistent pattern of Father's minimal engagement throughout the case.  Despite receiving notice of proceedings and being personally served with ICWA documentation, Father never contacted the Department, never provided ancestry information, and did not communicate with his attorney in a manner that allowed counsel to participate meaningfully on his behalf.  At the October 29, 2024 show-cause hearing, Father did not appear.  His counsel reported he had not heard from him about this case and therefore had "no authority to stipulate."  At the February 18, 2025 status hearing, Father again did not appear.  Counsel informed the court that Father remained incarcerated and that he had "no further updates."  Counsel did not thereafter report any communication from Father regarding treatment plan tasks, reunification efforts, or objections to the Department's recommendations.

¶9    The record reflects that Father failed to pick up mailed notices on at least two occasions, resulting in envelopes being marked "unclaimed."  Father did not file objections to Department reports, did not submit affidavits or statements, and did not, through counsel or otherwise, provide the court or Department with any real intention of a plan for reunification.

¶10   The Department filed a petition to terminate Father's rights under § 41-3-609(4)(c), MCA, asserting Father was, or would be, incarcerated for more than one year and reunification was not in D.J.L.'s best interests.

¶11   At the August 12, 2025 termination hearing, the Department asked the court to take judicial notice of Father's criminal sentences.  Counsel did not object, acknowledged the statutory presumption favoring termination, and stated he was "not in a position to argue

4

otherwise" because he had "very limited contact with [Father] throughout this case." The District Court terminated Father's parental rights, finding Father had been incarcerated throughout the case, would remain incarcerated for more than one year, and that reunification was not in D.J.L.'s best interests. At the time of termination, D.J.L. had been in foster care for 36 of his 38 months of life.

¶12 Father timely appealed.

¶13 We review a district court's decision to terminate parental rights for abuse of discretion. *In re E.Y.R.*, 2019 MT 189, ¶ 21, 396 Mont. 515, 446 P.3d 1117. The Department has the burden of proving by clear and convincing evidence that the statutory criteria for termination has been satisfied. *In re E.Y.R.*, ¶ 21. In the context of parental rights cases, clear and convincing evidence is the requirement that a preponderance of the evidence be definite, clear, and convincing. *In re E.Y.R.*, ¶ 21. A factual finding is clearly erroneous if not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review convinces this Court a mistake has been made. *In re E.Y.R.*, ¶ 21. Parents have a due process right to effective assistance of counsel in termination proceedings. *In re E.Y.R.*, ¶ 22; *In re A.S.*, 2004 MT 62, ¶ 20, 320 Mont. 268, 87 P.3d 408. Counsel's effectiveness is evaluated by the non-exclusive factors of training, experience, and advocacy. *In re E.Y.R.*, ¶ 22. Reversal for ineffective assistance of counsel (IAC) is required only if the parent suffered prejudice. *In re E.Y.R.*, ¶ 22.

¶14 ICWA applies only if the child is an "Indian child"—that is, the child is "either a (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a tribal member." 25 U.S.C. § 1903(4). When the Department has

"reason to know" a child may be an Indian child, it must conduct a reasonably diligent investigation and notify the tribe. 25 U.S.C. § 1912(a); *In re S.R.*, 2019 MT 47, ¶¶ 15-21, 394 Mont. 362, 436 P.3d 696. A "reason to know" requires more than vague assertions of ancestry. *In re S.R.*, ¶ 21. Whether a child is eligible for tribal membership and is thus an Indian child is a question of fact for exclusive determination by the Indian tribe(s) in regard to which the court has reason to know the child may be related. *In re S.R.*, ¶ 18. A tribe's determination of membership or eligibility is conclusive. *In re S.R.*, ¶ 18; 25 C.F.R. § 23.108(b).

¶15 Our recent decision in *In re L.C.*, 2026 MT 121, ___ Mont. ___, ___ P.3d ___, is instructive. There, we affirmed a finding of diligent inquiry where the Department: asked parents about ancestry, sent notices to the tribe, provided available identifying information, and received tribal responses that the children were not enrolled or eligible. *In re L.C.*, ¶ 6. We held that even minor errors—such as misspelling a putative father's name—did not defeat diligence where the Department had no reason to know the children were Indian children and the tribe issued a conclusive determination. *In re L.C.*, ¶ 20.

¶16 Here, similar to *In re L.C.*, the record demonstrates the Department undertook the steps required by ICWA and Montana law. The Department made inquiry of the parents; Mother could not provide information as to any tribal affiliations and, while Father was personally served with a detailed notice listing all known ancestors and tribal affiliations and was instructed to provide any additional information, he never responded. The Department sent additional "attempt to contact" letters to Father at prison to which he also never replied. The Department sent certified notices to the Chippewa Cree Tribe and the

Rocky Mountain Region of the BIA, including names, birthdates, and known ancestry of both parents and grandparents. The Chippewa Cree Tribe responded that D.J.L. was not eligible for enrollment and the Blackfeet Tribe likewise responded that D.J.L. was not an Indian child. These determinations were never contradicted or amended. Despite explicit instructions, Father never supplied any ancestry information, never contacted the Department to advise of any relevant ancestry information, and never appeared at any hearing, except through counsel.

¶17 Father argues the Department should have done more because DOC records show he has tattoos reading "Chippewa Cree" and "Rocky Boy." Father, however, did not provide this information to the Department despite multiple opportunities to do so. Further, tattoos are not evidence of tribal membership or eligibility. The Chippewa Cree Tribe of the Rocky Boy's Indian Reservation—the entity exclusively authorized to determine membership—conclusively found D.J.L. was not eligible.

¶18 As in *In re L.C.*, the Department conducted a diligent investigation, provided all known information, notified the appropriate tribes, and received conclusive tribal determinations. Nothing in the record suggests the tribes lacked information necessary to make their determinations, nor did Father ever supply additional information. The District Court did not err in finding that the Department made diligent efforts to determine the applicability of ICWA.

¶19 Next, Father asserts his counsel was ineffective and claims there is no conclusive evidence in the record that counsel had adequate communication with Father. Further, Father asserts counsel failed to advise the court at the time of the termination hearing that

7

Father could potentially be paroled within a few months, and instead acknowledged the statutory presumption that termination was in the best interest of the child and that Father was not in a position to argue otherwise.

¶20 To prevail on his IAC claim, Father must show deficiency in advocacy along with prejudice. *In re E.Y.R.*, ¶ 22. Father's assertion that there is no conclusive evidence in the record of counsel having adequate communication with Father is not persuasive. While the record does not detail extensive contact between counsel and Father, counsel was not required to detail his every communication with Father—and doing so may very well violate attorney-client privilege. There is nothing in the record to suggest Father desired more contact with counsel than he had—Father did not submit letters to the court or the Department indicating difficulty in contacting counsel—and his overall lack of participation with the Department demonstrates Father was not engaged in securing his parental relationship with D.J.L. The record does, however, show counsel attempted communication with Father but was unsuccessful, as counsel explained: "I haven't heard from him about this case"; "My client remains incarcerated . . . . I have no further updates"; and "I've had very limited contact with [Father] throughout this case." The record does not counter that Father's complete non-participation made it impossible for counsel to confirm Father's parole eligibility, develop a reunification plan, present evidence of sobriety, housing, employment, or parenting ability, or rebut the statutory presumption favoring termination. A parent cannot create the conditions for IAC by refusing to communicate with counsel.

8

¶21 Even assuming counsel should have raised Father's potential parole date, Father cannot show prejudice. Father had been incarcerated for nearly all of D.J.L.'s life. At termination, D.J.L. was 38 months old and had been in foster care for 36 of those months. There was no evidence showing Father would be able to parent immediately upon release. The record contains no evidence of Father's sobriety, housing, employment, treatment participation, visitation, relationship with D.J.L., or any plan for reunification. A speculative parole date does not rebut § 41-3-609(4)(c), MCA. The statute requires only that the parent is or will be incarcerated for more than one year and that reunification is not in the child's best interests. Father had already been incarcerated for three years. Even if paroled shortly after the hearing, he would not instantly become able to parent a toddler with whom he had no relationship.

¶22 The District Court reasonably relied on Father's long-term incarceration in terminating his parental rights. The court found Father's incarceration rendered him unable to meet the child's needs within a reasonable time. Nothing in the record contradicts that finding. Father cannot show a reasonable probability that the outcome would have been different had counsel raised a speculative parole date or had more communication with Father throughout the case. Thus, the District Court did not err in terminating Father's parental rights under § 41-3-609(4)(c), MCA.

¶23 The Department diligently investigated whether ICWA applied and received conclusive tribal determinations that D.J.L. is not an Indian child. Father's IAC claim fails because the record does not dispel that his own non-participation prevented counsel from presenting additional information, and because any alleged deficiency was not prejudicial.

9

The District Court reasonably relied on Father's long-term incarceration and properly terminated his parental rights under § 41-3-609(4)(c), MCA.

¶24    We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions.  In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶25    Affirmed.

                                                            /S/ INGRID GUSTAFSON


We Concur:

/S/ LAURIE McKINNON
/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA